

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

**FILED**
JUN 11 2008
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

WASHINGTON MUTUAL BANK      )
                            )
        Plaintiff,          )
                            )
vs.                         )   No 08 C 2874
                            )
LINDSAY JENKINS, ET AL.,    )   Judge Gettleman
                            )
        Defendants.         )

## CROSS-MOTION FOR SANCTIONS

## PURSUANT TO 28 USCA SEC. §1927

Defendant Lindsay Jenkins cross-moves the Court pursuant to 28 USCA § 1927 in response to a facially and patently spurious "Motion to Remand" by the Plaintiff as follows:

1. Plaintiff was a a substantial borrower of Washington Mutual("WM"). Due to incompetence on the part of WM, her financial affairs were confused, and WM then sought to harass Plaintiff by refusing to respond to any correspondence.

2. The latest harassment by WM, the filing of an abusive foreclosure case by a law firm that is obviously part of the "foreclosure machine," a group of law firms that file abusive foreclosure actions to harass and intimidate borrowers, is going

to be met by Defendant filing a lawsuit in the Western District of Washington against WM.[1]

4. WM's local law firm filed a frivolous motion to remand based on the claim that "Since the residence of Defendants 'Unknown Owners and Non-Record Claimants' cannot be ascertained, it is impossible to determine whether there is diversity of citizenship." This motion is nonsense. The law is very clear that "The citizenship of the real parties in interest is what counts." Spartech v. Opper, 890 F.2d 949, 952-953 (7th Cir. 1989) relying on Navarro Savings v. Lee, 446 U.S. 458, 100 S. Ct. 1779 (1980).

5. Unserved parties are also immaterial for purposes of removal. Opposing counsel made no claim he had served his alleged nonexistent defendants. Therefore, WM's law firm's motion was abusive, harassing and utterly without arguable legal merit. Section 1927 of Title 28 allows a court to impose sanctions where an attorney has "unreasonably and vexatiously" multiplied the proceedings. If ever there was a case where that section is applicable, the "Motion to Remand" filed by the Plaintiff is such a situation.

Wherefore, Defendant cross-moves the Court to impose sanctions on Plaintiff's counsel for filing a frivolous motion.

Dated: June 10, 2008

---

[1] See attached New York Times article.

Respectfully submitted,

*[signature]*

LINDSAY JENKINS
300 Burns Street
Forest Hills, NY 11375
Tel. (888) 552-2194
Fax (888) 696-3799
(not to exceed 10 pp. fax)

CERTIFICATE OF SERVICE

I certify I have served opposing counsel, Fisher and Shapiro, 4201 Lake Cook Road, Northbrook, IL 60062 via fax to (847) 291-3434 on June 10, 2008.

*[signature]*

LINDSAY JENKINS



PRINTER-FRIENDLY FORMAT
SPONSORED BY

March 30, 2008

## Foreclosure Machine Thrives on Woes

By GRETCHEN MORGENSON and JONATHAN D. GLATER

NOBODY wins when a home enters foreclosure — neither the borrower, who is evicted, nor the lender, who takes a loss when the home is resold. That's the conventional wisdom, anyway.

The reality is very different. Behind the scenes in these dramas, a small army of law firms and default servicing companies, who represent mortgage lenders, have been raking in mounting profits. These little-known firms assess legal fees and a host of other charges, calculate what the borrowers owe and draw up the documents required to remove them from their homes.

As the subprime mortgage crisis has spread, the volume of the business has soared, and firms that handle loan defaults have been the primary beneficiaries. Law firms, paid by the number of motions filed in foreclosure cases, have sometimes issued a flurry of claims without regard for the requirements of bankruptcy law, several judges say.

Much as Wall Street's mortgage securitization machinery helped to fuel questionable lending across the United States, default, or foreclosure, servicing operations have been compounding the woes of troubled borrowers. Court documents say that some of the largest firms in the industry have repeatedly submitted erroneous affidavits when moving to seize homes and levied improper fees that make it harder for homeowners to get back on track with payments. Consumer lawyers call these operations "foreclosure mills."

"They get paid by the volume and speed with which they process these foreclosures," said Mal Maynard, director of the Financial Protection Law Center, a nonprofit firm in Wilmington, N.C.

John and Robin Atchley of Waleska, Ga., have experienced dubious foreclosure practices at first hand. Twice during a four-month period in 2006, the Atchleys were almost forced from their home when Countrywide Home Loans, part of Countrywide Financial, and the law firm representing it said they were delinquent on their mortgage. Countrywide's lawyers withdrew their motions to seize the Atchleys' home only after the couple proved them wrong in court.

The possibility that some lenders and their representatives are running roughshod over borrowers is of increasing concern to bankruptcy judges overseeing Chapter 13 cases across the country. The United States Trustee Program, a unit of the Justice Department that oversees the integrity of the nation's bankruptcy courts, is bringing cases against lenders that it says are abusing the bankruptcy system.

Joel B. Rosenthal, a United States bankruptcy judge in the Western District of Massachusetts, wrote in a case last year involving Wells Fargo Bank that rising foreclosures were resulting in greater numbers of lenders that "in their rush to foreclose, haphazardly fail to comply with even the most basic legal requirements of the bankruptcy system."

Law firms and default servicing operations that process large numbers of cases have made it harder for borrowers to design repayment plans, or workouts, consumer lawyers say. "As I talk to people around the country, they all unanimously state that the foreclosure mills are impediments to loan workouts," Mr. Maynard said.

LAST month, almost 225,000 properties in the United States were in some stage of foreclosure, up nearly 60 percent from the period a year earlier, according to RealtyTrac, an online foreclosure research firm and marketplace.

These proceedings generate considerable revenue for the firms involved: eviction and appraisal charges, late fees, title search costs, recording fees, certified mailing costs, document retrieval fees, and legal fees. The borrower, already in financial distress, is billed for these often burdensome costs. While much of the revenue goes to the law firms hired by lenders, some is kept by the servicers of the loans.

Fidelity National Default Solutions, a unit of Fidelity National Information Services of Jacksonville, Fla., is one of the biggest foreclosure service companies. It assists 19 of the top 25 residential mortgage servicers and 14 of the top 25 subprime loan servicers.

Citing "accelerating demand" for foreclosure services last year, Fidelity generated operating income of $443 million in its lender processing unit, a 13.3 percent increase over 2006. By contrast, the increase from 2005 to 2006 was just 1 percent. The firm is not associated with Fidelity Investments.

Law firms representing lenders are also big beneficiaries of the foreclosure surge. These include Barrett Burke Wilson Castle Daffin & Frappier, a 38-lawyer firm in Houston; McCalla, Raymer, Padrick, Cobb, Nichols & Clark, a 37-member firm in Atlanta that is a designated counsel to Fannie Mae; and the Shapiro Attorneys Network, a nationwide group of 24 firms.

While these private firms do not disclose their revenues, Wesley W. Steen, chief bankruptcy judge for the Southern District of Texas, recently estimated that Barrett Burke generated between $9.7 million and $11.6 million a year in its practice. Another judge estimated last year that the firm generated $125,000 every two weeks — or $3.3 million a year — filing motions that start the process of seizing borrowers' homes.

Court records from 2007 indicate that McCalla, Raymer generated $10.4 million a year on its work for Countrywide alone. In 2005, some McCalla, Raymer employees left the firm and created MR Default Services, an entity that provides foreclosure services; it is now called Prommis Solutions.

For years, consumer lawyers say, bankruptcy courts routinely approved these firms' claims and fees. Now, as the foreclosure tsunami threatens millions of families, the firms' practices are coming under scrutiny.

And none too soon, consumer lawyers say, because most foreclosures are uncontested by borrowers, who generally rely on what the lender or its representative says is owed, including hefty fees assessed during the foreclosure process. In Georgia, for example, a borrower can watch his home go up for auction on the courthouse steps after just 40 days in foreclosure, leaving relatively little chance to question fees that his lender has levied.

A recent analysis of 1,733 foreclosures across the country by Katherine M. Porter, associate professor of law at the University of Iowa, showed that questionable fees were added to borrowers' bills in almost half the loans.

Specific cases inching through the courts support the notion that figures supplied by lenders are often incorrect. Lawyers representing clients who have filed for Chapter 13 bankruptcy, the program intended to help them keep their homes, say it is especially distressing when these numbers are used to evict borrowers.

"If the debtor wants accurate information in a bankruptcy case on her mortgage, she has got to work hard to find that out," said Howard D. Rothbloom, a lawyer in Marietta, Ga., who represents borrowers. That work, usually done by a lawyer, is costly.

Mr. Rothbloom represents the Atchleys, who almost lost their home in early 2006 when legal representatives of their loan servicer, Countrywide, incorrectly told the court that the Atchleys were 60 days delinquent in Chapter 13 plan payments two times over four months. Borrowers can lose their homes if they fail to make such payments.

After the Atchleys supplied proof that they had made their payments on both occasions, Countrywide withdrew its motions to begin foreclosure. But the company also levied $2,793 in fees on the Atchleys' loan that it did not explain, court documents said. "Every paycheck went to what they said we owed," Robin Atchley said. "And every statement we got, the payoff was $179,000 and it never went down. I really think they took advantage of us."

The Atchleys, who have four children, sold the house and now rent. Mrs. Atchley said they lost more than $23,000 in equity in the home because of fees levied by Countrywide.

The United States Trustee sued Countrywide last month in the Atchley case, saying its pattern of conduct was an abuse of the bankruptcy system. Countrywide said that it could not comment on pending litigation and that privacy concerns prevented it from discussing specific borrowers.

A generation ago, home foreclosures were a local business, lawyers say. If a borrower got into trouble, the lender who made the loan was often a nearby bank that held on to the mortgage. That bank would hire a local lawyer to try to work with the borrower; foreclosure proceedings were a last resort.

Now foreclosures are farmed out to third-party processors who hire local counsel to litigate. Lenders negotiate flat-fee arrangements to try to keep legal bills down.

AN unfortunate result, according to several judges, is a drive to increase revenue by filing more motions. Jeff Bohm, a bankruptcy judge in Texas who oversaw a case between William Allen Parsley, a borrower in Willis, Tex., and legal representatives for Countrywide, said the flat-fee structure "has fostered a corrosive 'assembly line' culture of practicing law." Both McCalla, Raymer and Barrett Burke represented Countrywide in the matter.

Gee Aldridge, managing partner at McCalla, Raymer, called the Parsley case unique. "It is the goal of every single one of my clients to do whatever they can do to keep borrowers in their homes," he said. Officials at

Barrett Burke did not return phone calls seeking comment.

In a statement, Countrywide said it recognized the importance of the efficient functioning of the bankruptcy system. It said that servicing loans for borrowers in bankruptcy was complex, but that it had improved its procedures, hired new employees and was "aggressively exploring additional technology solutions to ensure that we are servicing loans in a manner consistent with applicable guidelines and policies."

The September 2006 issue of The Summit, an in-house promotional publication of Fidelity National Foreclosure Solutions, another unit of Fidelity, trumpeted the efficiency of its 18-member "document execution team." Set up "like a production line," the publication said, the team executes 1,000 documents a day, on average.

OTHER judges are cracking down on some foreclosure practices. In 2006, Morris Stern, the federal bankruptcy judge overseeing a matter involving Jenny Rivera, a borrower in Lodi, N.J., issued a $125,000 sanction against the Shapiro & Diaz firm, which is a part of the Shapiro Attorneys Network. The judge found that Shapiro & Diaz had filed 250 motions seeking permission to seize homes using pre-signed certifications of default executed by an employee who had not worked at the firm for more than a year.

In testimony before the judge, a Shapiro & Diaz employee said that the firm used the pre-signed documents beginning in 2000 and that they were attached to "95 percent" of the firm's motions seeking permission to seize a borrower's home. Individuals making such filings are supposed to attest to their accuracy. Judge Stern called Shapiro & Diaz's use of these documents "the blithe implementation of a renegade practice."

Nelson Diaz, a partner at the firm, did not return a phone call seeking comment.

Butler & Hosch, a law firm in Orlando, Fla., that is employed by Fannie Mae, has also been the subject of penalties. Last year, a judge sanctioned the firm $33,500 for filing 67 faulty motions to remove borrowers from their homes. A spokesman for the firm declined to comment.

Barrett Burke in Texas has come under intense scrutiny by bankruptcy judges. Overseeing a case last year involving James Patrick Allen, a homeowner in Victoria, Tex., Judge Steen examined the firm's conduct in eight other foreclosure cases and found problems in all of them. In five of the matters, documents show, the firm used inaccurate information about defaults or failed to attach proper documentation when it moved to seize borrowers' homes. Judge Steen imposed $75,000 in sanctions against Barrett Burke for a pattern of errors in the Allen case.

A former Barrett Burke lawyer, who requested anonymity to avoid possible retaliation from the firm, said, "They're trying to find a fine line between providing efficient, less costly service to the mortgage companies" and not harming the borrower.

Both he and another former lawyer at the firm said Barrett Burke relied heavily on paralegals and other nonlawyer employees in its foreclosure and bankruptcy practices. For example, they said, paralegals prepared documents to be filed in bankruptcy court, demanding that the court authorize foreclosure on a borrower's home. Lawyers were supposed to review the documents before they were filed. Both former Barrett lawyers said that with at least 1,000 filings a month, it was hard to keep up with the volume.

This factory-line approach to litigation was one reason he decided to leave the firm, the first lawyer said. "I had questions," he added, "about whether doing things efficiently was worth whatever the cost was to the consumer."

James R. and Tracy A. Edwards, who are now living in New Mexico, say they have had problems with questionable fees charged by Countrywide and actions by Barrett Burke. In one month in 2002, when the couple lived in Houston, Countrywide Home Loans withdrew three monthly mortgage payments from their bank account, Mrs. Edwards said, leaving them unable to pay other bills. The family filed for bankruptcy to try to keep their home, cars and other assets.

Filings in the bankruptcy case of the Edwards family show that on at least three occasions, Countrywide's lawyers at Barrett Burke filed motions contending that the borrowers had fallen behind. The firm subsequently withdrew the motions.

"They kept saying we owed tons and tons of fees on the house," Mrs. Edwards said. Tired of this battle, the family gave up the Houston house and moved to one in Rio Rancho, N.M., that they had previously rented out.

Countrywide tried to foreclose on that house, too, contending that Mr. and Mrs. Edwards were behind in their payments. Again, Mrs. Edwards said, the culprit was a raft of fees that Countrywide had never told them about — and that were related to their Texas home. Mrs. Edwards says that she and her husband plan to sue Countrywide to block foreclosure on their New Mexico home.

Pamela L. Stewart, president of the Houston Association of Debtor Attorneys, said she has become skeptical of lenders' claims of fees owed. "I want to see documents that back up where these numbers are coming from," Ms. Stewart said. "To me, they're pulled out of the air."

An inaccurate mortgage payment history supplied by Ameriquest, a mortgage lender that is now defunct, was central to a case last year in federal bankruptcy court in Massachusetts. "Ameriquest is simply unable or unwilling to conform its accounting practices to what is required under the bankruptcy code," Judge Rosenthal wrote. He awarded the borrower $250,000 in emotional-distress damages and $500,000 in punitive damages.

Fidelity National Information Services has also been sued. A complaint filed on behalf of Ernest and Mattie Harris in federal bankruptcy court in Houston contends that Fidelity receives kickbacks from the lawyers it works with on foreclosure matters.

The case shines some light on the complex relationships between lenders and default servicers and the law firms that represent them. The Harrises' loan servicer is Saxon Mortgage Services, a Morgan Stanley unit, which signed an agreement with Fidelity National Foreclosure Solutions. Under it, Fidelity was to provide foreclosure and bankruptcy services on loans serviced by Saxon, as well as to manage lawyers acting on Saxon's behalf. The agreement also specified that Saxon would pay the fees of the lawyers managed by Fidelity.

But Fidelity also struck a second agreement, with an outside law firm, Mann & Stevens in Houston, which

spelled out the fees Fidelity was to be paid each time the law firm made filings in a case. Mann & Stevens, which did respond to phone calls, represented Saxon in the Harrises' bankruptcy proceedings.

According to the complaint, Mann & Stevens billed Saxon $200 for filing an objection to the borrowers' plan to emerge from bankruptcy. Saxon paid the $200 fee, then charged that amount to the Harrises, according to the complaint. But Mann & Stevens kept only $150, paying the remaining $50 to Fidelity, the complaint said.

This arrangement constitutes improper fee-sharing, the Harrises argued. Texas rules of professional conduct bar fee-sharing between lawyers and nonlawyers because that could motivate them to raise prices — and the Harrises argue that this is why the law firm charged $200 instead of $150. And under these rules, sharing fees with someone who is not a lawyer creates a risk that the financial relationship could affect the judgment of the lawyer, whose duty is to the client. Few exceptions are permitted — like sharing court-awarded fees with a nonprofit organization or keeping a retirement plan for nonlawyer employees of a law firm.

"If it's fee-sharing, and if it doesn't fall into those categories, it sounds wrong," said Michael S. Frisch, adjunct professor of law at Georgetown University. Greg Whitworth, president of loan portfolio solutions at Fidelity, defended the arrangement, saying it was not unusual for a company to have an intermediary manage outside law firms on its behalf.

The Harrises contend that the bankruptcy-related fees charged by the law firms managed by Fidelity "are inflated by 25 to 50 percent." The agreement between Fidelity and the law firm is also hidden, according to their complaint, so a presiding judge sees only the lender and the law firm, not the middleman.

Fidelity said the money it received from the law firm was not a kickback, but payments for services, just as a law firm would pay a copying service to duplicate documents. In response to the complaint, Fidelity asserted in a court filing that the Harrises' claims were "nothing more than scandalous, hollow rhetoric."

But the Fidelity fee schedule shows a charge for each action taken by the law firm, not a fee per page or kilobyte. And Fidelity's contract appears to indemnify Saxon if the arrangement between Fidelity and its law firm runs afoul of conduct rules.

Mr. Whitworth of Fidelity said that the arrangement with Mann & Stevens did not constitute fee sharing, because Fidelity was to be paid by that law firm even if the law firm itself was not paid.

He also said that by helping a servicer manage dozens or even hundreds of law firms, Fidelity lowered the cost of foreclosure or bankruptcy proceedings, to the benefit of the law firm, the servicer and the borrower. "Both parties want us to be in the middle here," Mr. Whitworth said, referring to law firms and mortgage servicing companies.

THE Fidelity contract attached to the complaint also hints at the money each motion generates. Foreclosures earn lawyers fees of $500 or more under the contract; evictions generate about $300. Those fees aren't enormous if they require a substantial amount of time. But a few thousand such motions a month, executed by lawyers' employees, translates into many hundreds of thousands of dollars in revenue to the law firm — and the lower the firm's costs, the greater the profits.

"Congress needs to enact a national foreclosure bill that sets a uniform procedure in every state that provides adequate notice, due process and transparency about fees and charges," said O. Max Gardner III, a consumer lawyer in Shelby, N.C. "A lot of this stuff is such a maze of numbers and complex organizational structure most lawyers can't get through it. For the average consumer, it is mission impossible."